IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32549-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID RANDALL PRIEST, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — David Priest appeals his convictions for trafficking in stolen property and possession of a stolen motor vehicle on the contention that Okanogan County Superior Court lacked jurisdiction over his prosecution because he is an enrolled member of the Confederated Tribes of the Colville Reservation (Colville Tribe) and the actions forming the basis of his convictions occurred solely on the Colville Reservation. Priest also challenges the warrantless search of his cell phone, recovered at the scene of a different alleged crime, as violative of his privacy rights under article I, section 7 of the Washington Constitution and the Fourth Amendment to the United States Constitution. He further challenges the admission of a witness's prior recorded statement. Finally, he assigns error to the imposition of legal financial obligations. We reject all but one of his

arguments. We affirm his convictions, but remand for a hearing on whether Priest may afford payment of discretionary legal financial obligations.

FACTS

The prosecution of David Priest arises from the theft of a trailer and all-terrain vehicles (ATVs) from the Okanogan County property of Harrell Myers. On December 22, 2012, Myers discovered that someone stole an enclosed race car trailer from his property located between the towns of Twisp and Pateros. At the time of the theft, the trailer housed four ATVs: a Honda, a red Suzuki, a yellow Bombardier, and a white side by side Polaris. Myers reported the theft to Okanogan County Sheriff Deputy Laura Wright.

On February 4, 2013, Okanogan County Sheriff Sergeant Tracy Harrison visited Shelly Priest at her home located in a housing project at 4116 Rocky River Road on the Colville Reservation. Shelly told Harrison that her former brother-in-law, David Priest, left possessions under a tarp in her backyard. With Shelly's permission, Harrison peered under the tarp and spied two ATVs: a yellow Bombardier and a white Polaris. Sergeant Harrison took photographs of the ATVs and ran the vehicles' identification numbers, but could not determine whether the vehicles were stolen.

Okanogan County sheriff deputies eventually learned that the yellow Bombardier and white Polaris ATVs belonged to Harrell Myers. The deputies later recovered one ATV down the street from Shelly Priest's residence and another at a different location in

2

Omak.

On February 14, 2013, Okanogan County Sheriff Sergeant Tracy Harrison contacted defendant David Priest. Priest commented to Harrison that he knew Harrison wanted to speak with him about ATVs. Priest told Harrison that the ATVs originated in the Methow Valley and that Josh Taylor, Nikki Windsor, and Josh Howell transported them to Shelly Priest's house from 232 Greenacres Road in Riverside, which residence belonged to his friend, Amanda VanSlyke. VanSlyke previously lived in a house on the Greenacres property, which also included a barn and a small garage. VanSlyke rented the garage to Priest, although he never paid her, and VanSlyke moved from the Greenacres property by the beginning of January 2013 after pipes to the house severed.

Law enforcement officers interviewed Amanda VanSlyke, who had no knowledge of David Priest entering the Greenacres garage after she moved from the property. She confirmed that Josh Taylor and Nikki Windsor brought and stored items in the barn. VanSlyke never saw Priest haul any vehicles to or from the Greenacres property.

David Priest also informed Sergeant Tracy Harrison that Josh Taylor, Nikki Windsor, and Josh Howell stole a 28-foot car trailer, modified it to a flatbed trailer in the barn on the Greenacres property, and sold it to Darren Morris. Sheriff Deputy Laura Wright visited Darren Morris and confirmed that he possessed Harrell Myers' stolen trailer. Deputy Wright obtained a search warrant for the outbuildings on Amanda VanSlyke's Greenacres Road property and discovered debris and trailer parts.

3

On February 23, 2013, Charles Nodine contacted law enforcement and reported that he recently purchased a Suzuki ATV and a Honda ATV, and he worried both were stolen. Nodine had announced in his home town of Oroville that he and his wife sought to purchase ATVs. At the suggestion of a friend, Nodine contacted a man named Danny in Omak, who had two ATVs for sale. Nodine also met a man named D.P., who helped negotiate the sale of the ATVs between Danny and him. Nodine paid $750 for the ATVs and agreed to pay more after receiving titles to the vehicles. When the titles never arrived, Nodine grew suspicious and contacted the Okanogan County Sheriff's Office. Nodine later identified D.P. as David Priest.

## PROCEDURE

In February 2013, the State of Washington charged David Priest with three counts of trafficking in stolen property in the first degree and two counts of possession of a stolen motor vehicle. The investigation of the crimes continued, however.

After filing of the charges, Frank Andre, a caretaker of an Omak vacation residence, discovered a cell phone on the ground outside a barn on the property. The snow had just melted, and the phone was wet. In January 2013, Andre had reported a burglary of the barns and his caretaker's residence. On the assumption that the phone belonged to the burglars of his residence, Andre delivered the phone to the Okanogan County Sheriff's Office. The phone lacked its back cover, but the memory card and subscriber identity module (SIM) card were intact. Okanogan County Sheriff Detective

4

Craig Sloan, certified in cell phone and computer forensics, removed the battery from the phone and placed both in a bag of uncooked rice to dry.

In December 2013, Detective Craig Sloan retrieved the cell phone and battery from the bag of rice. Sloan noticed that the SIM card had been installed incorrectly, so he removed the card and reinserted it in the phone. He implanted the battery in the cell phone and attempted to activate the phone, to no avail. Detective Sloan then connected the phone to a universal forensic extraction device (UFED) to charge the battery and extract information from the cell phone. The battery charged, but, because the UFED did not recognize the cell phone model, the device could not mine data.

Detective Craig Sloan activated the cell phone. The phone lacked service, but Sloan examined the phone's settings and found the phone's number, a number for a contact labeled "Home," and a third number for a contact labeled "Lynn." Clerk's Papers (CP) at 160. Sloan then viewed photographs on the cell phone. He discerned, in the grainy photographs, a red ATV or snowmobile and a yellow ATV or snowmobile. Sloan did not recognize any people shown in the photographs. Detective Sloan asked Okanogan County Sheriff Frank Rogers whether Frank Andre had reported the theft of any snowmobiles or four wheelers. Rogers replied in the negative, but added that Deputy Laura Wright had investigated the theft of red and yellow ATVs around the same time that Andre discovered the cell phone. Sloan deactivated the phone and returned it to storage.

5

Detective Craig Sloan then searched for the cell phone number, the "Home" number, and the "Lynn" number in the sheriff office's Spillman Data System. Sloan learned that David Priest maintained the cell phone number and home number. Lynn Stanley owned the "Lynn" number. Sloan knew that Stanley and Priest had engaged in a sporadic romantic relationship. Sloan reviewed Deputy Laura Wright's investigation reports for the Harrell Myers' property theft and obtained color copies of photographs of Myers' red and yellow ATVs. The ATVs matched the ATVs in the photographs on Priest's cell phone. Sloan reported the match to Deputy Wright, who used the information to obtain a search warrant for the cell phone.

After Laura Wright garnered a search warrant, Detective Craig Sloan reviewed all digital photographs, text messages, and voice recordings stored on the cell phone. Sloan discovered incriminating messages from December 2012 between David Priest and Nikki Windsor, one of the individuals that Priest identified as having stolen Harrell Myers' property. Messages read:

06:40 am Dec 11, 2012
To: +15093228640 (from David Priest)
    where r u? its 6:38 am did u ever go? Call

06:43 am Dec 11, 2012
From: +15093228640 (Nicki Windsor)
    Were in twisp trailer was a no ran out of gas going up the hill so it was too late doing other business be back soon feel free to use o car all you want!

01:37 am Dec 12, 2012
From: +15093228640 (Nicki Windsor)

So got up there gate was locked had to try and use truck didn't work i pussed out cause i need a nap. Bad. Sorry josh will have to do it tomorrow hope youre not too mad.

02:47 pm Dec 12, 2012
From: +15093228640 (Nicki Windsor)

He i got your money were waiting for dark to get trailer. Is there any way you would meet at the top? Got some sold over here at least a t could get rid of a b probably. but it'd be silly to drive truck over and back. What do you think? You could drive my car

09:37 pm Dec 12, 2012
From: +15093228640 (Nicki Windsor)

Hey its nicki lets chill for a minute k? We will be there im about am hour with truck trailer and your macbook, Im sorry we haven't made it yet its my fault I have your money and you guys are getting a pretty good pay day so please stop being mad were not trying to steal your truck and computer i promise. Call me please.

CP at 163-64.

Detective Craig Sloan also located a draft text message with a blank "To" field and the following text: "2003 suzuki 250 quad runner 600 great kids quad Obo dp." CP at 167. The text included a photograph of a yellow ATV. David Priest sent another text message to Nikki Windsor with a voice recording attached in which Priest stated: "'Hey, would you take pictures of each one of those and give me some numbers on them. What you—what we want' . . . 'Text it or whatever. I need those badly.'" Report of Proceedings (RP) at 636.

7

On December 20, 2013, Deputy Laura Wright recorded an interview with Frances

Edwards, who contacted the Okanogan County Prosecuting Attorney's office while

incarcerated and claimed she possessed information about the Harrell Myers case.

During the interview, Edwards commented that, between Christmas 2012 and New

Year's Day 2013, David Priest and his brother drove a red ATV and a yellow ATV onto

Edwards' lot in the housing complex on the Colville Reservation. A few days later,

Priest returned and negotiated the sale of the red ATV for $900 with two men and a

woman. Edwards added that Priest, at Edwards' insistence, later moved the yellow ATV

to Shelly Priest's residence.

David Priest moved the trial court to suppress evidence obtained through

Detective Craig Sloan's search of his cell phone. Priest argued that article I, section 7 of

the Washington Constitution, and our state's "Privacy Act," chapter 9.73 RCW,

prohibited the detective's prewarrant search of the phone's photographs and phone

numbers. The State contended that the warrant exceptions for voluntary abandonment,

plain view, and community caretaking justified Sloan's warrantless search of Priest's

phone. The State also argued that the Privacy Act did not apply because law enforcement

had not intercepted any of the phone's communications.

The trial court denied David Priest's motion and ruled that Priest voluntarily

abandoned the phone such that law enforcement did not need a search warrant before

actuating the phone and viewing its contents. The court also concluded that the search

was a reasonable exercise of the police's community caretaking function of identifying

the owners of lost property.

Some of the trial court's findings of fact and conclusions of law from the motion

to suppress follow:

## FINDINGS OF FACT

1. On January 2, 2013, Frank Andre reported a residential burglary at 22 Miller Road in Omak. The burglary involved the primary residence on the property and the caretaker residence.

2. Mr. Andre was the caretaker for the property and the elderly owners resided in Seattle during the winter.

3. At the time Mr. Andre discovered the burglary, there was still snow covering the ground.

4. Mr. Andre showed law enforcement officers foot and vehicle traffic observable in the snow.

5. The caretaker residence was attached to the barn and was located well inside the property and not near the roadway.

6. Neither the defendant, nor anyone else was given permission to enter the residence or the property.

7. The burglary occurred sometime between December 16, 2012 and January 2, 2013.

8. On February 26, 2013, Mr. Andre located an unidentified cellular phone near the barn/caretaker residence.

9. Mr. Andre did not know who the phone belonged to, and no one had made an inquiry of him about the phone or losing a phone.

10. The phone was wet, and due to its condition and the risk of damaging it or losing information, Mr. Andre did not attempt to activate the phone.

11. Within an hour of finding the phone, Mr. Andre turned the phone over to Sheriff Frank Rogers, to see if law enforcement could identify the owner.

12. Sherriff Rogers then turned the phone over to Detective Kreg [sic] Sloan, who placed the phone into a bag of rice to try and dry it out.

13. On December 25, 2013, Det. Sloan was processing multiple cell phones, and retrieved the phone turned in by Mr. Andre from the bag of rice.

9

14. The sim card had been placed in the phone backwards. The sim card was installed correctly and the battery was replaced in the phone.

15. The identity of the owner of the phone was unknown.

16. The phone was then charged and powered up, but it did not have a service connection.

17. Det. Sloan checked the phone settings, contacts, and viewed some photos to attempt to identify the phone's owner. Some of the photos viewed were of ATVs. Det. Sloan was unable to identify or recognized any persons in the photos.

18. The phone number for the phone was determined to be 322-8198; a number listed as "Home" was 422-0270, and another number for "Lynn" was 322-6564.

19. From [the] time the phone was lost, through [the] time it was viewed by police, there is no evidence that any report of the phone being lost or missing was made by the defendant or anyone else.

20. Det. Sloan asked Sheriff Rogers if any ATVs had been stolen in the Miller Road burglary. Sheriff Rogers indicated that Deputy Wright had a different burglary investigation that involved the theft and recovery of similar ATVs.

21. Det. Sloan reviewed the case reports for Deputy Wright's investigation of the Myers burglary, and on December 26, 2013, requested that Deputy Wright write a search warrant for the phone.

22. Search warrants were obtained for the phone data and records.

23. Through a search warrant for phone records, officers were able to determine the defendant was the legitimate account holder for the recovered cell phone and that photographs and messages in the phone were related to Deputy Wright's burglary and ATV theft investigation.

CONCLUSIONS OF LAW

1. The defendant did not have permission to be on the Miller Road property where the phone was located, and would have been trespassing if he had been there.

2. From the totality of the circumstances, the phone was abandoned at the Miller Road property.

3. The defendant in abandoning the phone, relinquished any reasonable expectation of privacy in the phone.

4. Law enforcement did not seize the phone as it was voluntarily placed with them by Mr. Andre.

5. Law enforcement did not engage in any unlawful conduct.

6. The abandonment was unrelated to, and unconnected with, any

10

action of law enforcement. Law enforcement did not cause the abandonment of the phone and there was no nexus between conduct of law enforcement and the abandonment.

7. A search warrant was not required by law enforcement to view information on the abandoned phone.

8. The actions by law enforcement were reasonable in their efforts to identify the owner of the abandoned phone.

9. A search warrant would also not have been required under law enforcement's exercise of their community caretaking function of receiving and safeguarding lost or abandoned property, and attempting to identify the legitimate owner of such property.

10. A search warrant would also not have been required where the information viewed on the phone was in plain view. The officer seeing photos that showed ATVs was incidental or inadvertent to the justifiable viewing of information sought to identify the owner possessor of the phone.

Suppl. CP at 1-5.

This prosecution proceeded to a jury trial. Harrell Myers, Laura Wright, Shelly Priest, Melissa Nodine, Charles Nodine, Darren Morris, and Amanda VanSlyke all testified consistent with our outlined facts. Frances Edwards, while still incarcerated for residential burglary and second degree theft, also testified. Edwards declared that she did not remember rendering a recorded statement to Deputy Laura Wright or speaking with law enforcement about David Priest's case. Outside the presence of the jury, the State asked to hold Edwards in contempt and to admit Edwards' prior statements through Deputy Wright. The State contended it could introduce the prior statements under ER 613, which entails the circumstances under which a party may reference a witness's prior statement and the steps to take to reference the statement, and ER 801(d)(1), which addresses prior statements by a witness not considered hearsay under the evidence rules.

11

Priest objected and argued that he lacked the opportunity to cross-examine Edwards and thus he would be denied his constitutional right to confront her as a witness. The State volunteered to ask Frances Edwards each of the questions that Deputy Laura Wright asked during the police interview to discern whether Edwards recalled answering each question. The trial court then asked Edwards if she could recall speaking with Wright, and, in response, Edwards asked to suffer a contempt charge. The court confirmed that Edwards refused to testify and then allowed the State to ask Edwards each of the questions earlier asked during the police interview.

The State proceeded to ask Frances Edwards each of the questions Deputy Laura Wright asked Edwards during the December 20, 2013 interview. To each and every query except one, Edwards replied that she did not recall. When asked if she spoke with her ex-husband about fear of being implicated in the burglaries, Edwards refused to answer under the Fifth Amendment.

During David Priest's cross-examination of Frances Edwards, the witness admitted a methamphetamine addiction, which severely affected her memory. Edwards also stated that, for at least ten years, she had suffered posttraumatic stress disorder and an anxiety disorder. She testified to a habit of fabricating stories and averred that her memory could not be trusted.

The State again requested, under ER 613 and ER 801, to play for the jury the recording of Frances Edwards' interview with Deputy Laura Wright. David Priest again

opposed the motion. He maintained that, because Edwards offered no testimony favoring either side, Edwards' prior statements were inadmissible, under ER 613, for impeachment purposes. Since Edwards could not recall any prior statement, no statement existed to be impeached. The State contended that, because Edwards denied recalling events, the trial court should admit her prior testimony. The State then switched its focus to ER 803(a)(5) that discusses recorded recollection. The court found Edwards unavailable due to her lack of memory and allowed the State, under ER 803, to play the recording during the testimony of Deputy Wright. The court's ruling does not mention whether the State could use the recording as substantive evidence or only impeachment evidence.

Before playing the recording of Frances Edwards to the jury, the trial court listened to the recording with counsel. After the airing, David Priest noted to the court that Deputy Laura Wright never placed Edwards under oath. Nor did Edwards ever aver to the accuracy of her statements. The trial court affirmed its prior ruling allowing playing of the recording. The court observed that Edwards' recorded statement echoed testimony from Charles and Melissa Nodine and other witnesses. During the interview, Edwards acknowledged that her comments were factual. Edwards knew Wright recorded the interview, Edwards gave permission for the recording, and the recording process was reliable.

The jury found David Priest guilty of three counts of trafficking in stolen property and two counts of possession of a stolen motor vehicle. When the trial court sentenced

13

Priest, the court conducted no inquiry regarding Priest's financial resources or ability to pay costs. The court imposed $310.50 in discretionary obligations, $800.00 in mandatory costs, including a $100.00 DNA collection fee, and $15,777.92 in restitution. The court ordered that Priest begin payment of his financial obligations immediately.

In his statement of additional grounds for review, David Priest contended that the State of Washington lacked jurisdiction to prosecute him for trafficking in stolen property and possession of a stolen motor vehicle because he is an enrolled member of the Colville Tribe and the crimes occurred on the Colville Reservation. This court then requested supplemental briefing from both sides to address this issue. This court also instructed David Priest to provide confirmation of his claim that he is an enrolled member of the Colville Tribe and to address whether the crime occurred on Colville Tribal land.

David Priest filed a supplemental brief that includes appendices containing Priest's certificate of Indian blood issued by the Colville Tribe and a copy of the Federal Register notice in which the State of Washington retroceded criminal and civil jurisdiction back to the Colville Tribe. In addition, Priest moved to admit an Okanogan County Assessor's land status report for Rocky River HUD Road and a letter from Okanogan County Assessor Scott D. Furman. Appellant's Mot. to Accept Additional Evid., Exs. A, B, No. 32549-1-III (Wash. Ct. App. Jan. 19, 2016).

As a result of the supplemental briefing, this court ordered the superior court to conduct a reference hearing for the purpose of answering these questions:

14

1. During what, if any dates, has David Priest been an enrolled member of the Confederated Tribes of the Colville Nation?

2. Whether David Priest knowingly initiated, organized, planned, financed, directed, managed, or supervised the theft of property for sale to others or knowingly trafficked in stolen property off the Confederate Tribes of the Colville reservation? If so, please indicate what stolen property, what acts Priest performed with regard to each item of property, the location of each act, and the date of each act.

3. Whether David Priest knowingly had possession of stolen motor vehicle off the Confederate Tribes of the Colville reservation? If so, please identify the vehicle and state the location and date of possession off the territory?

Superior Court's Findings of Fact From Evidentiary Hrg., *State v. Priest*, No. 13-1-

00044-8, at 1-2 (Okanogan County Super. Ct., Wash. Feb. 27, 2017)

The trial court conducted an evidentiary hearing, after which the court entered the

following findings of fact:

3. Defendant/Appellant Priest is an enrolled member of the Confederated Tribes of the Colville Reservation, federally recognized tribe, and was enrolled on the dates as alleged in the information, ie December 9, 2012 to February 4, 2013. . . .

. . . .

[4]e. . . . [The Polaris and Bombardier ATVs] were determined to have been stolen from the Harold [sic] Myers residence in Methow, WA (a location outside the external boundaries of the Confederated Tribes of the Colville Reservation).

. . . .

g. . . . David Priest was staying at 232 Greenacres Road, which is located north and west of the City of Omak, west of the Okanogan River and outside the boundaries of the Confederated Tribes of the Colville Reservation. . . .

h. On February 14, 2013, Sgt. Harrison spoke with David Priest at the Okanogan County jail. During that questioning David Priest knew the reason for Sgt. Harrison's contact, being the ATVs stolen from the Myers property. Priest indicated that the ATVs had come from the Methow

15

Valley (which would coincide with the Harold [sic] Myers Burglary) and he knew the people involved. He mentioned Josh Taylor, Nikki Windsor and Josh Howell had brought them over to 232 Greenacres Road (Amanda Van Slyke's place) . . . . Further he acknowledged that the ATVs were at 232 Greenacres Road before they were every [sic] taken to Shelly Priest's [residence]. The ATVs were being ridden and he saw that. He also indicated that he was staying at 232 Greenacres Road. He mentioned that the three—Josh Taylor, Nikki Windsor and Josh Howell, had stolen a 28 foot trailer. He stated *he heard them chopping it up* at 232 Greenacres Rd; that it was an expensive trailer and he *knew that [it] had been bought by Darren Morris* who had had contact with law enforcement while pulling it. Turns out that Sgt. Harrison was the officer who stopped Morris. When asked if he *knew how many ATVs were taken,* Priest indicated four (4) and then was *asked to describe them* which he stated were "a yellow one", "a white one", "a red one" but couldn't remember any other colors. Further *he described* one as being an 800, and another a 900 with one of them being a side by side, they were *the ones at Shelly Priest's* [*residence*]. Initially he told Sgt. Harrison that he told Shelly that he wanted to take the ATVs from her and basically "taxed them, for storing them there", he wanted to be compensated for them being kept at Shelly's House and he wanted to take the "side by side". But when Sgt. Harrison reminded him that he had earlier stated he had not had any conversation with Ms. Priest about the ATVs being there, he then answered "no, not that I recall." He stated that there were $20,000.00 worth of ATVs in Shelly Priest's back yard. From his interview of David Priest, Sgt. Harrison concluded that David Priest was trying to blame others—people he just met through Amanda Van Slyke, others took the ATVs to Shelly Priest's and others were involved in the thefts and trafficking of the stolen property. Yet as disclosed and brought out by other witnesses, David Priest wove a web of contacts and connections, engaged in the activities that told a different view then [sic] his statements or perceptions to Sgt. Harrison, ie Shelly Priest's insistent [sic] that David Priest brought the ATVs to her residence, from a location off the reservation, rather than others; Amanda Van Slyke's insistent [sic] that David Priest rented the garage/shop area where the trailer was chopped, stolen ATVs were kept, ridden, subsequently trafficked or moved from; and that Josh Taylor, Nikki Windsor, and Josh Howell were friends of David Priest who brought or invited them to 232 Greenacres Rd and with whom David Priest had communications by text and messaging with pictures of the stolen ATVs.

5. Trial Witness Amanda Van Slyke . . . resided [outside] the boundaries of the Confederated Tribes of the Colville Reservation. . . .

. . . .

c. [She] [t]hought something was going on at 232 Greenacres Road, as stuff was being brought to the place which she thought was probably not legal;

. . . .

e. After being shown Trial Exhibit (TE) 35, she identified the picture as being the barn rather than a garage, rented by David Priest, where pieces of the chopped Myers' trailer were found and subsequently identified by others at trial;

. . . .

[6]d. [Sheriff Deputy Laura Wright] interviewed and took a recorded statement from Charles Nodine and Melissa Nodine on February 23, 2013. They indicated that they bought the two ATVs in their possession on the reservation from "D.P." who was identified as David Priest. They described how they went between two houses, one being subsequently determined to be Shelly Priest's and the other Donna Priest's. They told her that DP was selling the ATVs for $3500.00 and they talked him down to $1500. . . .

. . . .

9. The Court finds, based upon the evidence presented at the trial and the evidentiary hearing, that David Priest did, as principal or accomplice, knowingly organized, planned, directed, managed or supervised a theft of property (consisting of four ATVs, 28-foot trailer and other miscellaneous personal property) from the Herbert [sic] Myers residence located near Carlton/Methow, Washington (which is located off of the Confederated Tribes of the Colville reservation). The theft occurred on or about . . . December 11th or 12th, 2012. David Priest provided a truck that was used to transport the trailer and the ATVs to the property at 232 Greenacres Road (which is off the Confederated Tribes of the Colville reservation) then being rented and used by David Priest. Further he directed in mid-January, 2013 the removal of several ATVs from that locality (off reservation) to the residence of his sister in law, Shelly Priest, and subsequently his mother's (both being on the reservation). However, he related to his sister in law and others that he was kicked out of his wife's (April Priest a/k/a April Bigelow) place (off reservation) when he brought the ATVs to Shelly Priest in mid-January (approximately between Jan. 12-20th as per Shelly). Further he had knowledge of the sale of the 28-foot

17

trailer in early January 2013 including its removal from the Greenacres property, the person (Darren Morris) who picked it up and that Mr. Morris had been stopped by a police officer while transporting because of no license or registration. He also had knowledge of the locations of the other ATVs (Mo Moses and Ms. Belgarde). He knew the stolen items were initially at the Greenacres property (off reservation) which he had rented from Amanda Van Slyke; although he attempted to deflect exposure from himself, other evidence of direct communication with the perpetrators clearly implicated him and was corroborated by testimony. He had communication with prospective buyers of the several ATVs who identified "D.P." as David Priest and testimony was provided that an attempt was made to move them (off reservation) to the prospective buyers but weather conditions prevented reaching their residence because of their service road/access.

. . . .

10. By his own admission, David Priest stated that the stolen ATVs were at the Greenacres Road Property (which is off reservation); the ATVs were brought there by Nikki Windsor, Josh Taylor and Josh Howell; the ATVs were seen being ridden there; that David Priest rented the garage/shop/barn from Amanda Van Slyke; and that he related to Shelly Priest and others that he had to move his stuff (including the ATVs) from his wife's place. However, his story of denial of involvement was not supported by evidence when others related his actions being inconsistent with his version of events and his subsequently discovered phone that provided both communication and photograph connections to the perpetrators of the theft and burglary at the Myers property (off reservation).

Superior Court's Findings of Fact at 3-7, 15-16.

## LAW AND ANALYSIS

### Subject Matter Jurisdiction

David Priest contends that the trial court lacked jurisdiction over his prosecution

for trafficking in stolen property and possession of a stolen motor vehicle. He argues that

he is an enrolled member of the Colville Tribe, and the State failed to present evidence at

18

trial that he illegally possessed the purloined ATVs "off reservation." He also contends that the State did not present evidence that he trafficked in stolen property "off reservation" under either of the two statutory means of committing trafficking in stolen property in the first degree. We disagree.

We do not know why David Priest did not raise the defense of lack of subject matter jurisdiction before the trial court. Nevertheless, a party may challenge a court's subject matter jurisdiction at any time, including for the first time on appeal. RAP 2.5(a)(1); *Matheson v. City of Hoquiam*, 170 Wn. App. 811, 819, 287 P.3d 619 (2012); *Wesley v. Schneckloth*, 55 Wn.2d 90, 94, 346 P.2d 658 (1959). Our Supreme Court explained over fifty years ago that, if a court lacks jurisdiction, any judgment entered is void ab initio and, in legal effect, no judgment at all. *Wesley v. Schneckloth*, 55 Wn.2d at 93-94.

Article IV, section 6 of the Washington State Constitution provides, in relevant part:

> The superior court shall have original jurisdiction . . . in all criminal cases amounting to felony, and in all cases of misdemeanor not otherwise provided for by law . . . . The superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court . . . .

This appeal turns on whether Okanogan County Superior Court's jurisdiction over David Priest's prosecution has been "vested exclusively in some other court."

19

The United States government acknowledges the Colville Tribe as having "the immunities and privileges available to federally recognized Indian Tribes." *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 5019 (Jan. 29, 2016). The State of Washington does not have criminal or civil jurisdiction over "Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States," save for eight enumerated legal issues, none of which apply here. RCW 37.12.010. However, the State may assume civil or criminal jurisdiction if requested by a tribe pursuant to RCW 37.12.021. RCW 37.12.010.

The Colville Tribe originally invoked the State of Washington's exercise of jurisdiction under RCW 37.12.021. Nevertheless, the State retroceded all civil and criminal jurisdiction to the tribe nearly thirty years ago. *See* Colville Indian Reservation, Washington; Acceptance of Retrocession of Jurisdiction, 52 Fed. Reg. 8372 (Mar. 17, 1987). Thus, if David Priest was an enrolled member of the Colville Tribe and trafficked or possessed stolen motor vehicles solely on "tribal lands or allotted lands within an established Indian reservation and held in trust by the United States," the State lacked jurisdiction to prosecute him. RCW 37.12.010; *State v. Clark*, 178 Wn.2d 19, 25, 308 P.3d 590 (2013).

20

The findings of fact confirm David Priest to be an enrolled member of the Colville Tribe. Nevertheless, the findings establish that both his possession of and trafficking in stolen property occurred, at least in part, outside the territory of tribal land. He assisted in purloining the ATVs and other property from owners living elsewhere in Okanogan County. He possessed the property at friends' homes off the reservation. Therefore, we hold the Okanogan County Superior Court possessed subject matter jurisdiction over this prosecution.

## Search of Cell Phone

David Priest next contends that the trial court erred in denying his motion to suppress evidence obtained through the warrantless search of his cell phone. He argues that he had a reasonable expectation of privacy in the contents of his phone under article I, section 7 of the Washington Constitution, and that Detective Craig Sloan's initial warrantless search of the phone's contacts and photos was unconstitutional. He maintains that no exception to the warrant presumption applies. Priest asks this court to suppress, as the fruit of an illegal search, all evidence obtained from the phone before and after Okanogan County Sheriff Deputy Laura Wright acquired a warrant.

The State responds that David Priest voluntarily abandoned his cell phone and thus he lacked a legitimate expectation of privacy in its contents. In the alternative, the State contends that the plain view, open view, and community caretaking exceptions to the

warrant requirement apply. Since we hold that David Priest voluntarily abandoned his cell phone in the field of the burglary, we do not address the other warrant exceptions.

We review a trial court's denial of a CrR 3.6 suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact and, if so, whether the findings support the trial court's conclusions of law. *State v. Cole*, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). Challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, when the findings go unchallenged, they are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). David Priest assigns error to the trial court's findings of fact 16, 17, and 20, and conclusions of law 2, 3, 5, 7, 8, 9, 10, and 11.

Searches conducted without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, subject only to a few specifically established and well-delineated exceptions. *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009); *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

22

Because of the mention of warrants in the Fourth Amendment, the law presumes that a law enforcement officer must obtain a warrant before a search. Any other reading of the amendment would render the language null.

Washington's Constitution provides: "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. Although the Washington Constitution does not mention warrants, state law also presumes that a law enforcement officer will obtain a judicial warrant before a search. The "authority of law" required by article I, section 7 to search or seize an item classified as a "private affair" is a valid warrant. *State v. Samalia*, 186 Wn.2d 262, 268, 375 P.3d 1082 (2016); *State v. Hinton*, 179 Wn.2d 862, 868-69, 319 P.3d 9 (2014).

The unique language of article I, section 7 generally provides greater protection to persons under the Washington Constitution than the Fourth Amendment. *State v. Snapp*, 174 Wn.2d 177, 187, 275 P.3d 289 (2012). The Washington Constitution provides added safeguards, in part, because unlike the Fourth Amendment, article I, section 7 clearly recognizes an individual's right to privacy with no express limitations. *State v. Ferrier*, 136 Wn.2d 103, 110, 960 P.2d 927 (1998). This broader reading of individual solitude extends to the area of search warrants. *State v. Snapp*, 174 Wn.2d at 187. The term "private affairs" in the Washington Constitution extends to information obtained through a cell phone. *State v. Hinton*, 179 Wn.2d at 877.

23

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.

*Riley v. California*, __ U.S. __, 134 S. Ct. 2473, 2494-95, 189 L. Ed. 2d 430 (2014) (internal quotation marks and citation omitted). A cell phone is more than a phone. A cell phone is a minicomputer, compass, camera, video player, rolodex, calendar, tape recorder, library, diary, album, television, map, or newspaper. *Riley v. California*, 134 S. Ct. at 2489.

Because our state constitution protects information housed on a cell phone, we must decide whether an exception to the warrant requirement permitted perusal of David Priest's phone. Washington allows a few jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to an arrest, inventory searches, plain view searches, voluntarily abandoned property, and *Terry* investigative stops. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009); *State v. Evans*, 159 Wn.2d 402, 407, 150 P.3d 105 (2007). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).

24

Under the common law, a person loses normal privacy interests in property upon abandonment. *State v. Samalia*, 186 Wn.2d at 273 (2016); *State v. Kealey*, 80 Wn. App. 162, 170-72, 907 P.2d 319 (1995). Law enforcement officers may retrieve and search voluntarily abandoned property without implicating an individual's rights under the Fourth Amendment or under article I, section 7 of our state constitution. *State v. Samalia*, 186 Wn.2d at 273; *State v. Reynolds*, 144 Wn.2d 282, 287, 27 P.3d 200 (2001). In this sense, voluntarily abandoned property differs from lost or mislaid property, in which the owner maintains a privacy interest in the property and the finder may have an obligation as a bailee to seek out the owner to return the property. *State v. Samalia*, 186 Wn.2d at 273; *Kealey*, 80 Wn. App. at 171-73. Thus, when an individual flees from law enforcement and leaves a cell phone behind in a stolen vehicle, a trial court may find that the cell phone is no less abandoned than any other item that was also left in the stolen vehicle. *State v. Samalia*, 186 Wn.2d at 273. Despite their chameleon natures, cell phones garner no more protection and gather no heightened scrutiny under the voluntary abandonment rule. *Riley v. California*, 134 S. Ct. at 2494-95 (2014); *State v. Samalia*, 186 Wn.2d at 274-75; *State v. Hinton*, 179 Wn.2d 862 (2014).

Two concrete rules assist in resolving this appeal. Washington courts generally find voluntary abandonment when a defendant leaves an item in a place in which the defendant has no privacy interest as an attempt to evade the police. *State v. Samalia*, 186 Wn.2d at 277 (2016); *State v. Evans*, 159 Wn.2d at 408; *State v. Young*, 86 Wn. App.

25

194, 197, 935 P.2d 1372 (1997), *aff'd*, 135 Wn.2d 498, 957 P.2d 681 (1998).

Conversely, Washington courts generally do not find voluntary abandonment if a

defendant takes steps to recover the property. *State v. Samalia*, 186 Wn.2d at 277-78;

*State v. Kealey*, 80 Wn. App. 162 (1995).

A controlling decision is *State v. Samalia*, 186 Wn.2d 262 (2016). Adrian Sutlej

Samalia fled on foot from a stolen vehicle during a lawful traffic stop, leaving his cell

phone behind in the vehicle. After Samalia successfully escaped, the police searched the

cell phone without a warrant and contacted one of the numbers stored in the cell phone.

The call led to Samalia's identification as the owner of the phone and driver of the stolen

vehicle. The State used the cell phone evidence against Samalia at trial. On appeal,

Samalia argued the seizure and search of his phone violated his right to be free from

unreasonable searches. The trial court held that Samalia voluntarily abandoned the phone

and, thus, the State needed no warrant to search the cell phone. The Supreme Court

affirmed on the basis that, although Samalia initially had a constitutionally protected

privacy interest in the cell phone and its data, he abandoned that interest when he

voluntarily left the cell phone in a stolen vehicle while fleeing from a lawful traffic stop.

David Priest may not have consciously left his cell phone at the Omak vacation

residence. We assume he accidentally dropped the phone when engaging in a burglary

on the property. Nevertheless, we also do not know if Adrian Samalia knowingly left his

phone in the car when he fled from police. Regardless, Priest must have known he lost

26

the phone. The phone sat on the property for months without Priest seeking to retrieve it.

Voluntary abandonment is an ultimate fact or conclusion based on a combination

of act and intent. *State v. Samalia*, 186 Wn.2d at 276 (2016); *State v. Evans*, 159 Wn.2d

at 408 (2007). As a factual determination, we review a trial court's finding of voluntary

abandonment for substantial evidence. *State v. Samalia*, 186 Wn.2d at 276; *State v.*

*O'Neill*, 148 Wn.2d at 571 (2003). Determining the reasonableness of an inference of

intent from proven facts is the province of the fact finder, not the appellate court. *State v.*

*Samalia*, 186 Wn.2d at 276; *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832

(1999). We conclude, based on substantial evidence, that the trial court did not err when

concluding that David Priest voluntarily abandoned the cell phone.

David Priest assigns error to the trial court's findings of fact 16, 17, and 20, and

conclusions of law 2, 3, 5, 7, 8, 9, 10, and 11. The challenged findings of fact read:

> 16. The phone was then charged and powered up, but it did not have a service connection.
> 17. Det. Sloan checked the phone settings, contacts, and viewed some photos to attempt to identify the phone's owner. Some of the photos viewed were of ATVs. Det. Sloan was unable to identify or recognized any persons in the photos.
> . . . .
> 20. Det. Sloan asked Sheriff Rogers if any ATVs had been stolen in the Miller Road burglary. Sheriff Rogers indicated that Deputy Wright had a different burglary investigation that involved the theft and recovery of similar ATVs.

Suppl. CP at 3-4. Ample evidence supports each of the three findings of fact. These

three findings also are not critical to the trial court's ruling.

27

David Priest challenges conclusions of law 2, 3, 5, 7, 8, 9, 10, and 11. To recap, those conclusions read:

2. From the totality of the circumstances, the phone was abandoned at the Miller Road property.

3. The defendant in abandoning the phone, relinquished any reasonable expectation of privacy in the phone.

. . . .

5. Law enforcement did not engage in any unlawful conduct.

. . . .

7. A search warrant was not required by law enforcement to view information on the abandoned phone.

8. The actions by law enforcement were reasonable in their efforts to identify the owner of the abandoned phone.

9. A search warrant would also not have been required under law enforcement's exercise of their community caretaking function of receiving and safeguarding lost or abandoned property, and attempting to identify the legitimate owner of such property.

10. A search warrant would also not have been required where the information viewed on the phone was in plain view. The officer seeing photos that showed ATVs was incidental or inadvertent to the justifiable viewing of information sought to identify the owner possessor of the phone.

11. There is no basis to suppress the evidence obtained from the phone. The motion to suppress is denied.

Suppl. CP at 5-6. Our holding with regard to abandonment confirms the validity of all conclusions of law, except conclusions 9 and 10. Since we affirm the trial court's ruling on the basis of voluntary abandonment, we need not address the soundness of conclusions of law 9 and 10.

## Frances Edwards' Recorded Statement

David Priest argues that the prosecutor committed misconduct by attempting to impeach Frances Edwards by playing a recorded interview of Edwards despite her

28

testimony that she could not recall making a tape-recorded statement to a deputy. Priest cites the rule that, to prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Priest also recognizes the rule that, if the defendant fails to object at the time the misconduct occurred, he must establish that no curative instruction would have obviated any prejudicial effect on the jury and that prejudice resulted that had a substantial likelihood of affecting the jury verdict. *State v. O'Donnell*, 142 Wn. App. 314, 328, 174 P.3d 1205 (2007). We do not know why Priest raises prosecutorial misconduct and writes about the failure to object when he objected during trial to the impeachment of Edwards and to the playing of the recording of Edwards' police interview. We address the propriety of the impeachment and use of the recording directly.

The State justifies playing of the Frances Edwards' recording by ER 613 and ER 803(a)(5). ER 803(a)(5) declares:

> **RULE 803. HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL**
> **(a) Specific Exceptions**. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>     . . . .
> (5) *Recorded Recollection*. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the

29

witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

A party may admit a witness's earlier recorded statement when the following factors are met: (1) the record pertains to a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony, (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory, and (4) the record reflects the witness's prior knowledge accurately. *State v. Alvarado*, 89 Wn. App. 543, 548, 949 P.2d 831 (1998); *State v. Mathes*, 47 Wn. App. 863, 867-68, 737 P.2d 700 (1987). We review the admission of statements under ER 803(a)(5) for an abuse of discretion. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997); *State v. Strauss*, 119 Wn.2d 401, 417, 832 P.2d 78 (1992); *State v. Alvarado*, 89 Wn. App. at 548.

Parties have litigated factor four of the four-part ER 803(a)(5) test. The rule itself prescribes no particular manner for answering this inquiry. Rather, the rule states the requirement passively by asking whether the testimony's proponent shows the record or memorandum to reflect the witness's prior knowledge correctly. *State v. Alvarado*, 89 Wn. App. at 549. According to one commentator, normally the witness testifies that, despite lack of memory, he or she remembers uttering the statement and that the statement was accurate when made. ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON, 803-35.0 (1994). Karl B. Tegland agrees: "The declarant should be

required, at trial, to attest to the accuracy of the memorandum or record." 5B KARL B. TEGLAND, WASHINGTON PRACTICE § 368 at 187 (3d ed. 1989). This court has reasoned, however, that the ideal practice in theory may be distant from the possible in practice. *State v. Alvarado*, 89 Wn. App. at 550. Tegland acknowledges that a witness's testimony that he or she habitually records matters accurately or would not have signed an inaccurate memorandum may suffice in lieu of an ideal foundation. TEGLAND, *supra*, § 368 at 186-87. This court has held, however, that the facts of a particular case may not allow a witness to testify to her general accuracy and ER 803(a)(5) does not require such testimony. *State v. Mathes*, 47 Wn. App. at 867-68. Such a conclusion follows from ER 803(a)(5) applying regardless of the declarant's availability to testify. If the rule does not require the declarant to testify, the rule does not require the declarant to vouch for the accuracy of the recorded statement. *State v. Alvarado*, 89 Wn. App. at 550.

Jurisdictions, including Washington, have endorsed admission of recorded recollections when sufficient indicia of reliability exist under a totality of the circumstances test. Relevant circumstances include the statement's proximity to the event litigated, a chronological description of the event's detail, the witness's coherence and use of logic, whether other witnesses corroborate the statement, whether the victim recants, whether the witness disavows accuracy, whether the witness averred accuracy at the time of making the statement, whether the recording process is reliable, and whether other indicia of reliability establish the trustworthiness of the statement. *State v.*

31

*Alvarado*, 89 Wn. App. at 551-52; *State v. Marcy*, 165 Vt. 89, 680 A.2d 76, 78 (1996).

The issue is best resolved on a case-by-case basis. *State v. Alvarado*, 89 Wn. App. at

551-52.

*State v. Alvarado* illustrates the operation of ER 803(a)(5). A jury convicted two

defendants of first degree murder. On appeal, the defendants argued they received

ineffective assistance when trial counsel failed to object to the admission of a witness's

prior recorded statements. Within eight days of the murder, police recorded an interview

with Louis Lopez. The recording established that Lopez knew of the events at the time of

the recording. At trial, he claimed he could not remember the events.

In *Alvarado*, this court ruled that defense counsel was not ineffective by failing to

object to the admission of Louis Lopez's two former statements, despite Lopez denying

any knowledge of the murder in a third statement. Lopez never recanted or disavowed

accuracy of the statements. The defense presented no evidence that the tapes did not

accurately reflect his statements. The statements were consistent with each other and

reflect a detailed and comprehensive knowledge of the crime. Lopez answered all

questions lucidly and at no time suggested that he was unsure of what he remembered.

After making the last statement, Lopez acknowledged on the tape that all the information

was "true and correct." Finally, the contents of the statements were corroborated in

varying degrees by the physical evidence and testimony of other witnesses, as well as by

one defendant's confession.

32

In the case on appeal, Frances Edwards never recanted her statement to Deputy Laura Wright. The trial court listened to the entire recording before allowing its admission. Although Edwards delivered her statement more distant than usual to the time of the events, the timing does not control the outcome. The trial court noted that witnesses corroborated Edwards' story. Edwards spoke intelligently and coherently expressed her percipient knowledge of the ATVs. Therefore, we hold that the trial court did not abuse its discretion when allowing the playing of the recording to the jury.

David Priest attacks the playing of the recording to the jury on grounds other than the applicability of ER 803(a)(5). Priest notes that, whereas the State may impeach its own witness, it may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible. *State v. Hancock*, 109 Wn.2d 760, 763-64, 748 P.2d 611 (1988). Nevertheless, David Priest does not show the recording to be otherwise inadmissible and does not contend the State knew in advance that Edwards would deny recollection of the events and her statement.

David Priest next argues that, under ER 613(b), extrinsic evidence of a witness's prior inconsistent statement is inadmissible unless the witness is given the opportunity to explain or deny the same and the opposing party is permitted to interrogate the witness on the matter. Nevertheless, the State asked Frances Edwards whether she had given the earlier recorded statement. The State posed the exact same questions asked Edwards during the interview. The State afforded Edwards the opportunity to deny uttering the

33

statement and to explain any statement she recalled. Thereafter, David Priest cross-examined Edwards concerning her ability to remember events.

David Priest emphasizes that, in *State v. Allen S.*, 98 Wn. App. 452, 464, 989 P.2d 1222 (1999), this court reversed a conviction on the ground that the State impeached a witness who purportedly did not recall giving a statement to law enforcement pertinent to the charges of child abuse against the defendant. Nevertheless, this court decided *Allen S.* under ER 613. The State did not seek to introduce the prior recorded statement under ER 803(a)(5).

## DNA Collection Fee

David Priest challenges the constitutionality of RCW 43.43.7541, the statute that imposes a $100 DNA collection fee on an offender. Priest raises both the equal protection and due process clauses. This court has already rejected both arguments. *State v. Lewis*, 194 Wn. App. 709, 379 P.3d 129, *review denied*, 186 Wn.2d 1025, 385 P.3d 118 (2016); *State v. Mathers*, 193 Wn. App. 913, 376 P.3d 1163, *review denied*, 186 Wn.2d 1015, 380 P.3d 482 (2016). We decline to address the constitutionality of the statute again.

## Discretionary Legal Financial Obligations

The trial court imposed $310.50 in discretionary obligations on David Priest. On appeal, Priest contends the trial court failed to address his ability to pay these obligations in violation of the Supreme Court's decision in *State v. Blazina*, 182 Wn.2d 827, 344

34

P.3d 680 (2015). The State does not respond to this assignment of error. A majority of the panel notes that the record shows no individual inquiry as to Priest's ability to pay the financial obligations. Therefore, we vacate the $310.50 of discretionary legal financial obligations and remand for a hearing on Priest's ability to pay the sum.

## MOTIONS

During the pendency of this appeal, appellant David Priest filed three motions. Two related motions ask this court to decline the State an award of costs on review and to permit late filing of the request. Because of the delays in resolving this appeal, we grant permission for late filing of the request. We take under advisement Priest's request to deny the State costs and direct Priest to comply with paragraph 3 of our June 10, 2016, general order.

On January 19, 2016, David Priest requested this court to accept additional evidence. We deny this motion since Priest had the opportunity to introduce the same evidence during the recent reference hearing before the superior court.

## CONCLUSION

We affirm all of David Priest's convictions. We vacate the judgment and sentence's imposition of $310.50 of discretionary legal financial obligations and remand for an individualized inquiry as to Priest's ability to pay the obligations.

No. 32549-1-III
*State v. Priest*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.